UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
L.L., *individually and on behalf of her minor child*, X.L.,

                                    Plaintiff,

                        -v-

NEW YORK CITY DEPARTMENT
OF EDUCATION, *et al.*,

                                  Defendants.
------------------------------------------------------------X

15-CV-4146 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

      Plaintiff L.L. filed this action against the New York City Department of Education ("the Department") and Carmen Fariña, in her official capacity as Chancellor of the Department, pursuant to the Individuals with Disabilities Education Act ("the IDEA"), 20 U.S.C. § 1400 *et seq.*, and Article 89 of the New York State Education Law, N.Y. Educ. Law § 4401 *et seq.*, seeking to reverse two administrative decisions of State Review Officers ("SROs") denying private school tuition funding for her minor son, X.L., whom she unilaterally enrolled in the Cooke Center for Learning and Development ("Cooke"). L.L. argues (1) that her son was denied a free appropriate public education ("FAPE"); and (2) that she is entitled to reimbursement for her son's tuition at Cooke for the duration of the due process challenge to the Department's proposed placement. Both parties now move for summary judgment. For the reasons that follow, the Court denies Plaintiff's motion and grants Defendants' cross-motion.

**I.    Background**

      This case comes to the Court following SRO review of two Independent Hearing Officer ("IHO") decisions. SRO Hauge affirmed the IHO's finding that X.L. was not denied a FAPE, and SRO Bates overruled the IHO's finding that Cooke was X.L.'s pendency placement. The

1

sections that follow provide first the legal context and then the factual context essential to understanding the disputes in this case.

### A. Legal Framework

The IDEA was enacted to "ensure that all children with disabilities have available to them a free appropriate public education" and to secure "the rights of children with disabilities and parents of such children." 20 U.S.C. § 1400(d)(1)(A), (B). The statute provides that a FAPE should "emphasize[ ] special education and related services designed to meet [a disabled child's] unique needs and prepare [the child] for further education, employment, and independent living." *Id.* § 1400(d)(1)(A). Under the IDEA, states that provide a FAPE to children with disabilities become eligible for federal funding. *Id.* § 1412(a); *see Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005).

The receipt of federal funding hinges on whether a state provides each disabled child with an individualized education program ("IEP"). *See* 20 U.S.C. §1414(d)(1)(A). The IEP is a document that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 508 (2d Cir. 2006) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)); *see also* 20 U.S.C. § 1414(d)(1)(A). Procedurally, the IDEA establishes a set of requirements for the IEP and emphasizes that the program should reflect input from a child's parents, representing "collaborations between parents, educators, and representatives of the school district." *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 81 (2d Cir. 2005) (quoting *Murphy v. Arlington Cent. Sch. Dist. Board of Educ.*, 297 F.3d 195, 197 (2d Cir. 2002)). Substantively, the IEP must be "reasonably calculated to enable the child to receive

educational benefits." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982); *accord Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105 (2d Cir. 2007).  But an IEP need not "furnish every special service necessary to *maximize* each handicapped child's potential." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir. 2003) (quoting *Rowley*, 458 U.S. at 199) (alterations omitted) (emphasis added).

New York State receives federal funds under the IDEA, and must comply with the statute's requirements. *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 123 (2d Cir. 1998).  State law also secures students' right to a FAPE.  N.Y. Educ. Law § 4401 *et seq.* (McKinney 2014).  It further tasks Committees on Special Education ("CSEs") with developing IEPs for disabled children.  *Id.* § 4402(1)(b)(1); *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012).  CSEs are composed of parents or guardians of the child, her regular education teacher, her special education teacher, a school psychologist, and a district representative knowledgeable about special education programs and the available resources in the district, among other individuals.  N.Y. Educ. Law § 4402(1)(b)(1)(a).  When crafting an IEP, a CSE must consider four factors:  a child's "(1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." *Gagliardo*, 489 F.3d at 107-08.

But the IEP does not need to provide for a specific school placement to effectuate the program.  *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009).  Instead, the New York City Department of Education typically provides "general placement information . . . such as the staffing ratio and related services, and then convey to the parents a final notice of recommendation . . . identifying a school at a later date." *R.E.*, 694 F.3d at 191.  Before placement is finalized, parents have a right to "acquire relevant and timely information as to the

3

proposed school" so that they can inquire whether the recommended school can, in fact, carry out the IEP.  *F.B. v. N.Y.C. Dep't of Educ.*, 132 F. Supp. 3d 522, 539 (S.D.N.Y. 2015) (quoting *C.U. v. N.Y.C. Dep't of Educ.*, 23 F. Supp. 3d 210, 227 (S.D.N.Y. 2014)).

Parents who believe that their child has been denied a FAPE may, "at their financial risk," unilaterally place their child in a private school and subsequently seek direct tuition payment or reimbursement from the school district.  *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 243 (2d Cir. 2015) (quoting *Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 760 F.3d 211, 215 (2d Cir. 2014)); *see* 20 U.S.C. § 1412(a)(10)(C)(ii).  To determine whether reimbursement or other payment is appropriate, courts apply the three-prong *Burlington*/*Carter* test, which examines: "(1) whether the school district's proposed plan will provide the child with a free appropriate public education; (2) whether the parents' private placement is appropriate to the child's needs; and (3) . . . the equities."  *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 73 (2d Cir. 2014); *see also Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369-70 (1985); *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 12 (1993). Reimbursements cover expenses that the school district "should have paid all along" had it provided a FAPE in the first instance.  *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per curiam) (quoting *Burlington*, 471 U.S. at 370-71).

If parents wish to seek reimbursement, they must file a due process complaint challenging the appropriateness of the school district's recommendation.  A hearing is then held before an impartial hearing officer.  20 U.S.C. § 1415(f); N.Y. Educ. Law. §4404(1).  The IHO's decision is appealable to a state review officer.  20 U.S.C. §1415(g); N.Y. Educ. Law § 4404(2). A parent may further challenge an SRO decision in state or federal court.  20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law. § 4404(3)(a).

"During the pendency of special education proceedings, unless the school district and the parents agree otherwise, federal and state law require that the child remain in his or her then-current educational placement." *Mackey ex rel. Thomas M. v. Bd. of Educ. for Arlington Cent. Sch. Dist.*, 386 F.3d 158, 160 (2d Cir. 2004), *aff'd in part, rev'd in part sub nom. Mackey v. Bd. of Educ. for Arlington Cent. Sch. Dist.*, 112 F. App'x 89 (2d Cir. 2004) (citing 20 U.S.C. § 1415(j) (the "stay-put" provision); 34 C.F.R. § 300.514(a); N.Y. Educ. L. § 4404(4)(a)). "Although not defined by statute, the phrase 'then current placement' has been found to mean the last agreed upon placement at the moment when the due process proceeding is commenced." *Arlington Cent. Sch. Dist. v. L.P.*, 421 F. Supp. 2d 692, 696 (S.D.N.Y. 2006). The then-current placement, or "pendency placement," is typically the last IEP agreed to by the parent, but may be superseded "if there is an agreement between the parties on placement during the course of a proceeding, whether or not it is reduced to a new IEP." *Id.* at 696-97 (citing *Bd. of Educ. of Pawling Cent. Sch. Dist. v. Schutz,* 137 F. Supp. 2d 83 (N.D.N.Y. 2001), *aff'd,* 290 F.3d 476, 484 (2d Cir. 2002)). "An agreement in which a board of education agrees to pay tuition to a private school makes that school the child's pendency placement unless the stipulation is explicitly limited to a specific school year or definite time period." *Id.* at 697 (citing *Zvi D. v. Ambach*, 694 F.2d 904, 908 (2d Cir. 1982)).

### B.     Factual Background

The following facts and procedural background are taken from the parties' submissions and the administrative record.

X.L. has learning challenges. He is sixteen, with Attention Deficit Disorder and an IQ of 55. (Dkt. No. 25 ¶¶ 1, 2.) Until 2009, X.L. was home-schooled. (*Id.* ¶ 4.) From 2009 to 2011, he enrolled at Hawthorne Country Day School ("Hawthorne"), a state-approved non-public

school that the Department recommended under X.L.'s operative IEP ("March 2010 IEP").  (*Id.* ¶ 7.)

Believing her son was making "only minimal progress" at Hawthorne, L.L. (X.L.'s mother) requested an IEP meeting to discuss X.L.'s learning needs.  (Dkt. No. 21 ¶ 17.)  For the following school year (2011-12), L.L. unilaterally placed her son at Cooke.  (*Id.* ¶ 20.)  She filed a due process complaint in November 2011 seeking tuition coverage at Cooke, and an IHO resolved the matter under a Stipulation of Settlement and Discontinuance ("2011-12 Stipulation") dated February 2012, providing for tuition at Cooke for that year.  (Dkt. No. 25 ¶¶ 9-10.)  The 2011-12 Stipulation makes clear that it does not establish a "then current placement" for the purposes of pendency.  (Dkt. No. 21 ¶ 20.)

The following year, X.L. again enrolled her son at Cooke, filed a due process complaint, and sought the year's tuition at Cooke.  (Dkt. No. 25 ¶¶ 11-12.)  An IHO resolved the matter in a Stipulation of Settlement and Discontinuance ("2012-13 Stipulation") in February 2013, again awarding tuition.  (*Id.* ¶¶ 14-15.)  That stipulation provides, in part:

> Neither (a) this Stipulation nor (b) the Respondent's provision of, or its reimbursement to the Parent for the costs of tuition . . . shall be relied upon by any party to indicate, establish or support the position that it constitutes a recommendation by the [Department] that the Student attend the [Cooke] School or that the [Cooke] School constitutes an appropriate placement.

(*Id.* ¶ 15.)  It further constrained its application "for the limited purpose of the settlement . . . for the 2012-2013 school year," and made clear it did "not entitle the parent or the student to receive . . . reimbursement of or funding for any costs associated with the student's attendance . . . at the [Cooke] School during any subsequent school year."  (*Id.*)

After X.L.'s placement for 2012-13 had been finalized, a CSE convened to create an IEP for the following school year ("February 2013 IEP").  (Dkt. No. 25 ¶ 16.)  The CSE

6

recommended a twelve-month school year in a special education class with a maximum of twelve students and including one special education teacher and a teaching assistant ("12:1:1"), as well as various learning goals, support in transitions between classes, and speech, occupational, and physical therapy. (*Id.* ¶¶ 18, 20; Dkt. No. 22 at 5-6.) There is no dispute as to the adequacy of the IEP. (Dkt. No. 25 ¶ 22.)

The 2013-14 school year was set to begin on July 1, 2013 for students, like X.L., on a twelve-month academic calendar. (Dkt. No. 22 at 19 n.4.) In mid-May, L.L. had not received her son's prospective placement for the next school year. (Dkt. No. 25 ¶ 24.) She reenrolled X.L. at Cooke for the 2013-14 school year. (*Id.* ¶ 23.) The enrollment contract permitted L.L. to withdraw her son from Cooke if the Department later proposed an appropriate placement for the 2013-14 school year. (*Id.*) On June 19, 2013, L.L. sent the Department a letter explaining that, because X.L. had not been given an appropriate placement under the IEP, she intended to enroll him unilaterally at Cooke and would again seek a hearing for payment or reimbursement by the Department. (*Id.* ¶ 24.)

L.L. contends that it was not until June 27, 2013, one business day before the start of the twelve-month school year, that she received her son's placement in the mail. (*Id.* ¶ 25.) The notification, dated June 25, 2013, recommended that X.L. be placed in a special needs class, V31, at P.S. 373 – Brooklyn Transition Center (K373) ("P.S. 373K"). (Dkt. No. 25 ¶ 25.) On July 10, a "family worker" at P.S. 373K, Ms. Guillaume, gave L.L. and a representative from Cooke a tour of the school. (*Id.* ¶ 26-27.)

Based on that tour, L.L. decided the placement could not meet X.L.'s needs under his

IEP.[1]  (Dkt. No. 15 at 2, 16; Dkt. No. 21 ¶¶ 73-74, 88-89)  As a result, she kept her son at Cooke for the 2013-14 school year.  (Dkt. No. 25 ¶ 38.)  On November 5, 2013, L.L. initiated the underlying administrative proceeding.  (*Id.* ¶ 39.)  She argued that the Department should cover X.L.'s tuition at Cooke for the year because he had been denied a FAPE and that X.L. at least had a right to remain at Cooke during the resolution of the proceedings since it constituted his pendency placement.  (*Id.* ¶ 41-42.)

A hearing was held before an IHO.  (*Id.* ¶ 43.)  The IHO found that L.L. was not entitled to reimbursement because the proposed placement did not deny X.L. a FAPE.  (*Id.* ¶¶ 51-53.)  On review, an SRO found the same.  (*Id.* ¶ 55.)  The IHO also determined that Cooke was X.L.'s pendency placement.  (*Id.* ¶ 45.)  An SRO overturned that ruling, holding instead that a placement under the March 2010 IEP—the last IEP agreed upon by the District and L.L.—was X.L.'s pendency placement because the terms of the subsequent settlements were limited.  (*Id.* ¶¶ 43-49.)

This case thus comes to the Court following SRO review of two IHO decisions.  SRO Hauge affirmed the IHO's finding that X.L. had not been denied a FAPE, and SRO Bates overruled the IHO's finding that Cooke was X.L.'s pendency placement.

L.L. argues that she was procedurally denied her right to participate in her child's placement and that X.L. was substantively denied access to a FAPE.  L.L. further contends that, independent of the merits of her challenge to X.L.'s proposed placement, Cooke is X.L.'s pendency placement and she should be reimbursed for the tuition for the period of these

---

[1]   The merits of L.L.'s belief are disputed.  (Dkt. No. 22 at 7-8.)  Various individuals, including the special education teacher assigned to X.L.'s CSE, testified about how the specific services available at P.S. 373K could satisfy X.L.'s IEP.  (*Id.*; Dkt. No. 25 ¶¶ 28-37.)

8

proceedings.

**II.     Discussion**

"IDEA actions generally are resolved on summary judgment." *J.W. v. N.Y.C. Dep't of Educ.*, 95 F. Supp. 3d 592, 600 (S.D.N.Y. 2015) (quoting *S.H. v. N.Y.C. Dep't of Educ.*, No. 10 Civ. 1041, 2011 WL 666098, at *2 (S.D.N.Y. Feb. 15, 2011)). But the summary judgment posture in an IDEA action is unusual: "the procedure is in substance an appeal from an administrative determination, not a summary judgment motion." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir.2012) (internal quotation marks and brackets omitted). Thus, "[s]ummary judgment in this context involves more than looking into disputed issues of fact; rather, it is a pragmatic procedural mechanism for reviewing administrative decisions." *M.O.*, 793 F.3d at 243 (quoting *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir.2009)) (internal quotation marks omitted). The inquiry is focused on "whether the administrative record, together with any additional evidence, establishes that there has been compliance with the IDEA's processes and that the child's educational needs have been appropriately addressed." *D.C. ex rel. E.B. v. N.Y.C. Dep't of Educ.*, 950 F.Supp.2d 494, 498 n. 1 (S.D.N.Y.2013) (internal quotation marks omitted).

"While the district court must base its decision on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *M.O.*, 793 F.3d at 243 (quoting *A.C.*, 553 F.3d at 171). This deference is heightened when, as with the determination that X.L. was not denied a FAPE, the IHO and SRO agree. When, as with the pendency placement holdings, "the decisions of an IHO and a SRO conflict, the Court should generally defer to the SRO's decision as the final decision

of the state authorities." *J.W.*, 95 F. Supp. 3d at 601 (quoting *F.B.*, 923 F. Supp. 2d at 578) (internal quotation marks omitted).

### A.      Reimbursement under the *Burlington/Carter* Test

This case is relatively unusual because L.L. challenges the appropriateness of X.L.'s proposed placement under the IEP rather than the sufficiency of the IEP itself.  *See J.W.*, 95 F. Supp. 3d at 602.  L.L. argues that her son was denied a FAPE and is entitled to placement at Cooke under the three-pronged *Burlington/Carter* test.  The underlying administrative hearings reached only the first prong, which examines whether the Department's proposed program or placement would deny the student a FAPE.[2]  This Court need not look further.

L.L. argues that the Department violated the IDEA's procedural and substantive guarantees.  Procedurally, L.L. argues that the Department denied her the opportunity to "participate" in her son's placement.  And substantively, L.L. argues that the Department failed carry its burden to establish that X.L.'s proposed placement could meet the student's needs.

### 1.      Procedural Rights Under the IDEA

Under *Burlington/Carter*'s first prong, courts first look to alleged procedural violations.

The IDEA provides parents with a right "to participate in the decisionmaking process." 20 U.S.C. § 1415(f)(3)(E)(ii).  When it comes to prospective placement under the IEP, parents have a right to "input" with the school district, but they do not have a "veto" over placement. *T.Y.*, 584 F.3d at 420.  Parents are entitled to "sufficient information about the proposed placement school[ ] . . . to make an informed decision as to the school's adequacy." *D.C.*, 950 F. Supp. 2d at 510.  But that information need not be communicated on a tour.  *See, e.g., C.U.*, 23

---

[2]      In a due process challenge, the Department has the burden to demonstrate that it provided a FAPE both procedurally and substantively.  N.Y. Educ. Law § 4404(1)(c).

F. Supp. 3d at 229 (finding that the Court need not reach the issue of whether a procedural violation of a "right to visit" a placement school had occurred when the "relevant information [sought by parents], *i.e.* resource availability, could have been acquired by telephone or an alternate means"); *J.W.*, 95 F. Supp. 3d at 606 (rejecting as speculative a parent's argument—based in part on what a staff member allegedly said during a school tour—that a proposed school could not implement an IEP).

      L.L. argues that the tour of P.S. 373K given by Guillaume did not provide her with the answers she needed and that this, in turn, impaired her ability to gather the information necessary for her participation in the placement decisionmaking process. Guillaume was hard to understand and did not appear generally reliable or knowledgeable about the school. (Dkt. No. 15 at 14-16; Dkt. No. 21 ¶¶ 68-70.) That Guillaume failed to provide complete information on the tour (Dkt. 15 at 14-15), and in fact may have misstated or misrepresented features of the school (*id.* at 22; Dkt. No. 21 ¶¶ 71-78, 80, 82-83), is unfortunate but does not itself constitute a violation of L.L's rights under the IDEA. *See B.P. v. N.Y.C. Dep't of Educ.*, 634 Fed. App'x. 845, 848 (2d Cir. 2015) (citing *School Comm. Of Town of Burlington*, 471 U.S. at 373-74 (1985)) (finding no procedural violation of the IDEA where a tour guide provided misinformation about the prospective placement). That L.L. relied on the information provided her on the tour, recognizing even then that her guide seemed unqualified (Dkt. No. 15 ¶¶ 19-21), suggests that she should have endeavored to engage with other resources or representatives in order to discern whether the placement was suited to her son's needs. *J.W.* 95 F. Supp. 3d at 606 ("The Parents' action in rejecting the [recommended school] without engaging in a conversation with the Public School about how the school would attempt to meet [the student's] needs 'suggest that they seek a veto over school choice, rather than input—a power . . . [the] IDEA

11

clearly does not grant them.'" (quoting *T.Y.*, 584 F.3d at 420)).  L.L. has thus not made out a procedural violation under the IDEA.

In the alternative, L.L. contends that the Department violated her procedural rights by notifying her of X.L.'s placement very late in the summer—one business day before the start of the twelve-month school year.  (Dkt. No 15 at 13-14.)  The Second Circuit has held that an IEP provided only days before the start of the school year does not violate the IDEA's guarantee of timely placement.  *See Cerra*, 427 F.3d at 193-94 (characterizing the school district's obligation under the IDEA as "providing the IEP before the first day of school").  However, it has also noted that delayed placements put parents in a predicament as the start of a new school year nears.  *See id*.  L.L.'s decision to enroll X.L. at Cooke with just weeks to go before the start of the new school year is understandable in light of the Department's delays, but the receipt of the proposed placement on June 27 was not per se untimely under this Circuit's reading of the statute.[3]  *Id.*

It would be a closer case were a plaintiff to allege specific facts about how the delayed IEP or proposed placement prevented her from accessing information necessary to evaluate the placement through all potentially available channels—violating not the right to a timely IEP or placement but, collaterally, the right to access information.  Without such a specific showing, the Court cannot conclude that the last-minute placement violated L.L.'s procedural rights under the IDEA.

---

[3] In evaluating the timeliness of notification of X.L.'s placement, this Court is especially aware of its position, reviewing the findings of the IHO and SRO, as well as the processes of the Department, which engages in a high volume of highly complex placements under the IDEA each year.  As such, it is especially difficult for a federal court to deem the Department's actions unacceptable.  *See Cerra*, 427 F.3d at 194 n.4 (noting that delays were caused by a backlog of IEPs and understaffing).

### 2. Substantive Rights Under the IDEA

Failing a procedural violation, under *Burlington/Carter*'s first prong, courts next look to whether the placement violated the student's substantive rights under the IDEA. In reviewing the determinations of the IHO and SRO, this Court is especially deferential to questions of education policy, methodology, or pedagogy. *See Rowley,* 458 U.S. at 208. Accordingly, when parents do not object to the IEP and have not enrolled their child in the proposed placement, the burden is on the parents "to establish that the school district would not have adhered to the written plans." *J.W.*, 95 F. Supp. 3d at 603 (quoting *N.S. v. N.Y.C. Dep't of Educ.*, No. 13 Civ. 7819, 2014 WL 2722967, at *2 (S.D.N.Y. June 16, 2014)). This burden is exceedingly difficult to meet. In fact, "[t]here should be few circumstances . . . in which parents can, if there is an adequate IEP, successfully challenge a placement if their child never attended the school." *Id.* at 604 (quoting *N.S.*, 2014 WL 2722967, at *2) (alterations in original).

In evaluating such a claim, a court may consider "only information that was available to the parents at the time that they rejected the recommended placement," not evidence discovered after they made the choice. *Id.* The court then considers whether, based on that information, the parent's decision to reject the proposed placement was adequately "supported" or "merely speculative." *Id.* (citing *R.E.*, 694 F.3d at 195).

"[V]ery few" plaintiffs have succeeded in challenges to a proposed placement where the child never enrolled. *Id.* Where plaintiffs have made the required showing, there was a clear and obvious conflict between the child's IEP and the proposed placement. *Id.* In one case, a child with a severe seafood allergy and an IEP guaranteeing a "seafood free environment" received a placement at a school where, upon visiting, the parents learned that the cafeteria prepared seafood. *D.C.*, 950 F. Supp. 2d at 509-11. In another, the IEP guaranteed one-on-one

occupational therapy, but the proposed placement had a six-to-one ratio. *B.R. ex rel. K.O. v. N.Y.C. Dep't of Educ.*, 910 F. Supp. 2d 670, 676-77 (S.D.N.Y. 2012).

L.L. identifies several aspects of the IEP that she doubted P.S. 373K could meet, including small group instruction, adaptive furniture, and a curriculum geared toward X.L.'s educational goals. (Dkt. No. 15 at 25; Dkt. No. 21 ¶ 73.) But her basis for this conclusion was exclusively the tour provided her by Guillaume. On that tour, L.L. inferred from the way furniture was arranged that X.L.'s student-to-teacher ratio could not be met. (Dkt. No. 15 at 19.) And she concluded from the lack of adaptive furniture that the school would not ultimately provide it for her son. (*Id.* at 20.) She additionally learned some disputed information about the curriculum and other features of P.S. 373K from Guillaume, though she alleges that she found Guillaume not credible or qualified. (Dkt. No. 21 ¶¶ 70, 75, 77, 82, 83, 84, 86.) Based on Guillaume's representations and what she observed, L.L. concluded that P.S. 373K could not meet X.L.'s learning needs. (*Id.* ¶¶ 73-74, 88-89.)

L.L.'s inferences based on what she observed do not rise to the level of the plain conflict between the IEP and placement that the court found in *D.C.* or *B.R. See N.K. v. N.Y.C. Dep't of Educ.*, 961 F. Supp. 2d 577, 592 (S.D.N.Y 2013) (holding that "[t]he fact that Plaintiffs did not observe . . . on their site visit" certain equipment provided for in the IEP is "insufficient to demonstrate that [the school] lacked such equipment or that the school would not obtain the equipment necessary to implement [the child's] IEP should [he or she] attend the school"); *see also E.P. v. N.Y.C. Dep't of Educ.*, No. 14 Civ. 6032, 2015 WL 4882523, at *8 (E.D.N.Y. Aug. 14, 2015) (explaining that, in order to succeed, a challenge would need to "show that the [Department] was unwilling or unable to obtain the equipment necessary to satisfy the IEP"); *B.K. v. N.Y.C. Dep't of Educ.*, 12 F. Supp. 3d 343, 372 (E.D.N.Y. 2014) ("The mere fact that [the

parent] did not observe 'various suspended equipment' when he visited [the school] is insufficient to establish that the IEP would not have been properly implemented."). And L.L.'s reliance on the information Guillaume provided was, by her representation, misplaced. *See J.W.*, 95 F. Supp. 3d at 606; *see also F.L. ex rel. F.L. v. N.Y.C. Dep't of Educ.*, No. 11 Civ. 5131, 2012 WL 4891748, at *14 (S.D.N.Y. Oct. 16, 2012) (upholding the SRO's determination that a placement was not insufficient where the plaintiff's challenge was "based on her single hour-and-a-half visit to [the school]"). As in *J.W.*, L.L. does not appear to have raised all her questions about the sufficiency of the placement on the tour and further declined to follow up with someone more qualified than Guillaume. *J.W.*, 95 F. Supp. 3d at 606. This Court therefore defers to the SRO's determination that L.L.'s objection to the placement was "speculative." *See id.* (citing *F.L. ex rel. F.L.*, 2012 WL 4891748, at *14).

Because the Court holds for the Department on the first prong of the *Burlington*/*Carter* test, it need not reach the remaining two issues, whether X.L.'s placement at Cooke was appropriate and whether equitable considerations should impact relief here.

### B. Pendency Placement

L.L. argues that, separate from any alleged procedural or substantive defect with the Department's permanent placement, X.L. is entitled to remain at Cooke during the pendency of proceedings related to his placement. While X.L. has some placement rights during the pendency of these proceedings, his rights do not include placement at Cooke.

Federal and state laws do not give X.L. the right to remain at Cooke.[4] During the

---

[4] The meaning of "then-current" and "placement" under the relevant statutes are pure questions of law, so the findings below are not entitled to deference on this point. However, the SRO below properly determined that the "then-current placement" was, under the law, the general program agreed upon in the March 2010 IEP. (Dkt. No. 1.)

pendency of the due process review proceedings, parents are entitled to have the child "stay put" in his or her "current educational placement." *Honig*, 484 U.S. at 323; *see* 20 U.S.C. § 1415(j); 34 C.F.R. § 300.514; N.Y. Educ. Law § 4404(4)(a). The "current" program has been understood as that "described in the child's most recently implemented IEP." *Mackey*, 386 F.3d at 163 (quoting *Johnson v. Special Educ. Hearing Office*, 287 F.3d 1176, 1180 (9th Cir. 2002)). And the relevant "placement" has been interpreted to mean the "same general level and type of services . . . [or] 'type of educational program'" described in the last IEP, not the right to placement at a particular school. *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 171 (2d Cir. 2014) (quoting *Concerned Parents & Citizens for the Continuing Educ. at Malcolm X (PS 79) v. N.Y.C. Bd. of Educ.*, 629 F.2d 751, 753 (2d Cir. 1980)). X.L., then, is not granted the right to remain at Cooke, or indeed any specific school,[5] during the pendency of proceedings; instead, he is entitled to placement at an educational program at the level described in the last IEP agreed upon by the parent and the District: the March 2010 IEP.

L.L. argues that the 2012-13 Settlement, granting her reimbursement for Cooke, has superseded the March 2010 IEP for the purposes of pendency placement. But "[p]ayment and placement are two different matters." *Zvi D.*, 694 F.2d at 908. In this Circuit, "then current placement" will, in "most cases" be "the last unchallenged IEP." *L.P.*, 421 F. Supp. 2d at 696-97. "[A]ny pendency so created will be superseded . . . if there is an agreement between the parties on placement during the course of a proceeding, whether or not it is reduced to a new IEP." *Id.* (citing *Schutz,* 137 F. Supp. 2d 83). But an agreement by the district to "pay tuition to

---

[5] L.L. argues that the March 2010 IEP cannot serve as X.L.'s pendency placement because her son is too old to attend the school originally assigned under that IEP and an alternative placement has not been identified. (Dkt. No. 24 at 13-14.) But these arguments are unavailing because X.L.'s right to pendency placement guarantees him only a general "program," not a specific school placement.

16

a private school" does not make that school the child's pendency placement if "the stipulation is explicitly limited to a specific school year or definite time period."  *Id.* at 697 (citing *Zvi D.*, 694 F.2d at 908); *see Zvi D.*, 694 F.2d at 907-08 (holding that a reimbursement settlement was not the appropriate antecedent for pendency placement determination because it was limited to one school year with a "view toward placing him in an appropriate public program" the next year).

Here, L.L. secured two reimbursement settlements, but neither supersedes the March 2010 IEP.  The 2011-12 Settlement expressly negates the possibility of pendency placement, using the statute's language.  It reads, in relevant part: "Neither (a) this Stipulation nor (b) the . . . reimbursement . . . shall be relied upon by any party to indicate, establish or support the position that . . . the [Cooke] School constitutes the 'then current placement' for the 2011-12 school year or any subsequent school year."  (Dkt. No. 21 ¶ 20.)  The 2012-13 Settlement is similarly "limited to a specific school year or definite time period," *L.P.*, 421 F. Supp.2d at 697, the "2012-2013 school year" (Dkt. No. 25 ¶ 14).  It does "not entitle the parent or the student to receive . . . reimbursement of or funding for any costs associated with the student's attendance . . . at the [Cooke] School during any subsequent school year."  (*Id.* ¶ 15.)  The Settlement further makes clear that it does not "constitute[ ] a recommendation by the [Department] that the Student attend the School or that the school constitutes an appropriate placement."  (*Id.*)  By its own terms, the 2012-13 Settlement is limited to the 2012-13 school year and limited to reimbursement; it therefore does not supersede the March 2010 IEP for the purpose of pendency placement.

L.L. further argues that the omission of an express disclaimer using the IDEA's "then-current placement" language in the 2012-13 Settlement is significant, given that such language appears in the 2011-12 draft.  (Dkt. No. 15 at 47.)  But a single missing phrase is not enough to

erase the 2012-13 Settlement's express language limiting it to an agreement for payment for a single year of X.L.'s schooling.  *See L.P.*, 421 F. Supp. 2d at 696-97; *Zvi D.*, 694 F.2d at 907-08.  Moreover, the 2012-13 Settlement was reached just six days before the new CSE convened to create X.L.'s IEP for the 2013-14 school year.  (Dkt. No. 25 ¶¶ 14, 16.)  The timing further supports a reading of the 2012-13 Settlement as resolving only payment for that year, as the Department moved swiftly toward finding a new, mutually agreeable placement for X.L.  *C.f. Gabel ex rel. L.G. v. Bd. of Educ. of Hyde Park Cent. Sch. Dist.*, 368 F. Supp. 2d 313, 325 (S.D.N.Y. 2005) (holding that a settlement agreement superseded the last operative IEP where, among other factors, there was no clear intention of finding an alternative placement for the student).  The Court therefore concludes that the March 2010 IEP stands as X.L.'s "then-current placement" for pendency-placement purposes.

      Based on the administrative record below, to which this court defers especially on questions of fact, L.L. has not established the exceptional circumstances required to prove that the March 2010 IEP disserves her son such that it could not serve as the basis for his pendency placement.  *See id.* (departing from the last IEP in favor of a settlement where the school district conceded in administrative proceedings that the IEP was "not appropriate" for the student and where the settlement did not limit reliance upon it for pendency disputes).

**III.     Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED, and Plaintiffs' motion for summary judgment is DENIED. The Clerk of Court shall enter judgment accordingly.

The Clerk is directed to close the motions at Docket Numbers 14 and 19 and to close the case.

SO ORDERED.

Dated: August 29, 2016
          New York, New York

_____
J. PAUL OETKEN
United States District Judge